UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LARRY BALL,

                    Plaintiff,                                    Case Number 19-10315
v.                                                               Honorable David M. Lawson

BRIAN EVERS, FREDERICK UDELL,
JESSICA SMALLEY-THOMPSON, and
ROBERT JOHNSON,

                    Defendants.

_____/

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Larry Ball, a former Michigan prisoner, is a gay man who was subjected to sexual harassment during his incarceration by Zachary Perkins, a prison guard employed by the Michigan Department of Corrections (MDOC). He brought suit against Perkins and other MDOC employees under federal and state law. Perkins was fired for his misconduct and no longer is part of this lawsuit. The remaining defendants have moved for summary judgment, raising several arguments, including qualified immunity as to Ball's federal claims. Ball has not produced sufficient evidence to establish a triable case on any of his claims as to defendants Evers, Smalley-Thompson, or Johnson. Fact issues preclude summary judgment for defendant Udell on Ball's Eighth Amendment and First Amendment retaliation claims and part of the claim based on state law. Therefore, the Court will grant in part and deny in part the motion for summary judgment.

I.

Via his second amended complaint, Ball asserts claims against defendants Fredrick Udell (a corrections officer) and Robert Johnson (an MDOC investigator) for violating his rights under the Eighth Amendment's prohibition against cruel and unusual punishment; against defendants

Udell and Brian Evers (a resident unit manager) for unlawful retaliation under the First Amendment; and against all defendants, including Jessica Smalley-Thompson (a prison counselor) under Michigan's Elliot Larsen Civil Rights Act, Mich. Comp. Laws § 37.2701, *et seq.*, for creating a hostile environment and *quid pro quo* discrimination. Ball has abandoned all his claims against defendant Smalley-Thompson. The claims against the other remaining defendants are based on the following facts in the record.

### A. Perkins's Harassing Conduct

On July 18, 2014, Ball, an openly gay African-American man, began serving a four-year sentence for retail fraud at the MDOC's Charles Egeler Reception Center. During his initial intake, the MDOC identified Ball as a likely victim of sexual assault due to his open homosexuality and small stature (5'7" tall and weighing 135 pounds).

The MDOC transferred Ball to various facilities until it placed him at the Gus Harrison Correctional Facility (formerly the Adrian Residential Facility, commonly referred to by the parties as "ARF") on November 26, 2014. There, Ball was housed in the C-Unit, a semi-open, minimum-security housing unit composed of "cubes" that hold eight prisoners each in cells. The cubes are not fully enclosed; the walls are "a couple feet high," allowing corrections officers to view and hear activities in the cubes. The MDOC housed Ball in the fourth cube in the front hall of the C-Unit, and housed another homosexual prisoner, Austin Cook, in the first cube in the front hall. Generally, the MDOC stations an officer at a desk inside the C-Unit's lobby.

Around the beginning of 2016, Ball alleges that corrections officer Zachary Perkins had become sexually attracted to him and started "to act on that attraction." Perkins first saw Ball in the C-Unit, where, after seeing Ball's apparent sexual orientation (he occasionally dressed in drag), he said, "Hi Ma'am. I mean Sir." Perkins then began repeatedly calling Ball out on the prison yard. Ball believed that as an inmate, he had no choice but to obey Perkins's requests to approach

him.  When Ball complied, Perkins conducted intrusive pat-downs followed by discussions about personal sexual matters.  During these pat-downs, Perkins often groped Ball's genitals, which Ball found extremely offensive and upsetting.

By around March or April 2016, Perkins began regularly visiting the C-Unit, even though he was not stationed there.  Perkins would initially stop by the officer's station in the lobby to converse with defendant Frederick Udell, a corrections officer who usually was stationed in the C-Unit from 2:00 p.m. to 10:00 p.m.  Then Perkins would visit and chat with Cook, the other homosexual inmate in the C-Unit.  From there, Perkins would work his way to Ball's cell, where he would spend up to twenty minutes talking with Ball, including conversations that were sexually oriented."  Perkins regularly visited Ball up to four times per week for over eight weeks, through early June 2016.  Joseph Christlieb, who occupied the same cube as Ball, swore that "Perkins would come into the cube almost every day when [] Udell was on duty, even though Perkins was obviously not assigned to C-Unit."  Christlieb Aff., ECF No. 71-16, PageID.1367, ¶ 2.

Ball contends that officer Udell knew about Perkins's improper interactions with Ball because "Udell's desk was only a couple feet away, [] he was looking directly at Perkins and me during these interactions," and "Perkins would speak in a loud voice," making the conversations easily heard. Ball Aff., ECF No. 71-13, PageID.1284, ¶ 35; Ball dep., ECF No. 71-10, PageID.1232.  During his deposition, Udell admitted that he saw Perkins repeatedly visit Ball's cell, but he could not recall how long the visits lasted and insisted that he could not hear what they were discussing.  During a subsequent interview, however, he stated that Perkins "always" went to Ball's cell when he visited the C-Unit and that the visits lasted a "while . . . maybe 10 or 15 minutes," sometimes longer.  Johnson Report, ECF No. 71-5, PageID.1018-19.

Additionally, Perkins conducted "shakedowns" of Ball's cube in the presence of Udell. During these shakedowns, Perkins asked Ball to step out of the cube, and Perkins would pat him down, often groping his genitals.  Perkins also called Ball derogatory names, including "fag," "sissy" and "d\*ck sucker," according to a C-Unit inmate, in a voice "loud[] enough to be heard throughout the front hall."  Christlieb Aff., ECF No. 71-16, PageID.1367, ¶ 9.  Then Perkins would direct Ball to go to the dayroom, which was beside the officer's station in the lobby, and they would pass Udell on the way.

Ball also alleges that Perkins wrote a letter to him and Cook, indicating that Ball's appearance got him sexually aroused and that if he had an opportunity, he "would take [Ball] into the front hall closet as well as Austin Cook."  Ball dep., ECF No. 71-10, PageID.1211; Johnson dep., ECF No. 71-9, PageID.1170-71.

## B.  Report, Investigation, and Perkins's Termination

The parties provide different accounts of what happened next.

Ball contends that, on May 24, 2016 around 9:15 a.m., he verbally reported Perkins's sexual harassment to defendant Robert Johnson, an officer in charge of investigating sexual harassment of prisoners.

The defendants tell a different story.  They note that Ball never filed a grievance or kite about Perkins's conduct until August 29, 2016, after the MDOC resolved the issue and transferred Ball to a different facility.  Ball's prison record reflects only one grievance filed while he was housed in the Gus Harrison facility, but it pertains to unrelated harassment by different officers.

The defendants contend that Investigator Johnson never learned about Perkins's harassment of Ball until June 10, 2016, when he investigated complaints that Perkins was harassing Cook, the gay inmate in the first cube of the C-Unit.  According to Johnson, he heard rumors that

Perkins delivered an inappropriate letter to Cook.  Johnson followed up with Cook, who denied having received any letters from Perkins but stated that Perkins "is always stopping by my cube on his way to Ball's cube."  When asked to elaborate, Cook told Johnson that "everyone knows that Perkins has a thing for Ball," that he hangs out with Ball almost every night, and that they discuss intensely sexual subjects, like "who has seen more d\*cks and what gay clubs" they attend. Johnson reported that the alleged incidents occurred on May 28 through 30, 2016.

Following up on Cook's allegations, Investigator Johnson interviewed Perkins on June 13, 2016.  In his report, Johnson expressed the belief that "Perkins was actively manipulating his presentation to conceal certain facts[,] making it probable that Perkins' actions" violated various employee rules.  Johnson Report, ECF No. 71-5, PageID.1016.  Investigator Johnson reported his suspicions, and the Warden assigned him to formally begin an investigation.  The next day, Johnson alerted Perkins about the allegations and began interviewing various persons of interest. He interviewed Udell, Perkins (twice), Ball, Cook, prisoners Williams, Prince, Christlieb, Britton, Jackson, and Cole; and he issued written questionnaires to Udell (returned on June 27) and Perkins (July 1).

After conducting his investigation, Johnson concluded that Perkins engaged in a non-mutual relationship with Ball, he often left his post to visit Ball without authorization, he tried to conceal the relationship, and "Perkins knew that this relationship and those communications were improper." *Id.* at PageID.1024.  Johnson submitted his report to the Deputy Warden on August 2, 2016, concluding that "there appears to be sufficient evidence to support the allegation made and as such, Zachary Perkins may have violated" several employee rules.  *Ibid.*  The Deputy Warden reviewed the report, agreed with Johnson, and presented it to the Warden on August 4, 2016.

The Warden agreed, and on August 8, 2016, the Deputy Warden issued a "Stop Order" prohibiting Perkins from entering the prison. The prison then held a disciplinary hearing on August 28, 2016 and terminated Perkins's employment on September 12, 2016.

Ball interprets the stop order as a "no-contact" order prohibiting Perkins from communicating with Ball. Ball also testified that Johnson told him that Perkins could not interact with Ball "because he had a no contact order." The MDOC defendants insist that no such thing exists, and that "the MDOC does not utilize 'no-contact orders.'"

### C. Retaliation

Ball alleges that MDOC officers retaliated against him for raising the issue about Perkins. The retaliation purportedly began with Investigator Johnson's June 16, 2016 interview of officer Udell. According to Johnson, Udell was "clearly reluctant to provide truthful responses, but eventually did so." Johnson Report, ECF No. 71-5, PageID.1018. Three days later, on June 19, 2016, the MDOC transferred Udell from the C-Unit to the F-Unit.

Then, on June 21, 2016, Ball was walking in the yard past the F-Unit when Udell yelled at him through a window, accusing him of snitching on staff. The record does not indicate whether any inmates witnessed this altercation. The next day (June 22), Investigator Johnson came to the C-Unit with defendant Resident Unit Manager Brian Evers and removed all prisoners in Ball's cube for interviews. The prisoners corroborated that Perkins visited Ball's cube frequently. Right after the interviews, Ball visited Investigator Johnson, crying and trembling, asking for protection from Perkins, staff, and other prisoners.

Later that day, a member of a prison gang known as the Gangster Disciples, who was housed in Ball's cube, cornered Ball in the bathroom, accused him of snitching, and threatened him. Ball was aware that inmates attacked accused snitches with shanks or other makeshift

weapons, like combination locks, boiling water, or socks with batteries in them.  After receiving threats from his fellow inmates, Ball became terrified for his safety and relayed his concerns to Investigator Johnson and Prison Counselor Jessica Smalley-Thompson.  Smalley-Thompson informed Ball that he could not file a grievance because Perkins was already under investigation, nor could she transfer him out of the facility, even though the MDOC transferred Cook.  On June 29, 2016, Ball called the Prison Rape Elimination Act (PREA) unit of the MDOC but got no response.

About one month later, on July 27, Investigator Johnson called Ball back to the control center, asking him to help acquire more evidence against Perkins.  Johnson told Ball that he wanted to use Ball as "bait" for Perkins and other staff members for smuggling because Ball was "the Queen of the facility."  Fearing for his safety, Ball refused.  Johnson denies these allegations and he testified that he never called Ball a queen, never asked Ball to bait Perkins, never had any interactions with Ball outside the confines of his investigation, and that Ball never requested protection.

That same day, Resident Unit Manager Evers stopped Ball in the C-Unit and angrily accused Ball of "messing" with his staff.  Later that day, Evers allegedly ordered a search of Ball's cell (which is contained within the cube), and charged Ball with smuggling feminine products, like makeup, skin cream, and hair product — the offense for which Johnson requested Ball's cooperation as "bait" earlier in the day.  Ball was then placed in segregation for several days until he was given a hearing that resulted in the dismissal of the smuggling charge.  When Ball was released from segregation on August 4, 2016, he was placed in a higher security level.  After the Deputy Warden issued the stop order against Perkins on August 8, the MDOC transferred Ball to the Carson City Correctional Facility.

While at the Carson City facility, Ball filed an official PREA grievance detailing the treatment by Perkins, Johnson, Udell, and Smalley-Thompson on August 29, 2016.  The MDOC responded that the grievance had already been sustained after the investigation.

Ball obtained psychiatric help during and after his incarceration for the trauma he suffered from the sexual harassment and alleged retaliation.  Ball has been diagnosed with post-traumatic stress disorder (PTSD) as a result of Perkins's treatment, and continues to suffer from the condition.

### D.  Procedural History

On April 17, 2017, while incarcerated and proceeding *pro se*, Ball filed his first complaint against the defendants.  After being served with the complaint, Perkins requested representation by the Michigan Department of Attorney General, Corrections Division.  The MDOC denied the request on June 13, 2017.  Ball was released from prison in November 2018 and moved to dismiss the case without prejudice.  The Court granted the motion.

On February 1, 2019, Ball filed a new complaint against Perkins, Udell, Johnson, Evers, and "ARUS/PCS Smalley and Johnson," alleging violations of his rights under the Eighth and First Amendments asserted via 42 U.S.C. § 1983 (Counts 1 and 2).  The complaint also stated state law claims under the Elliot-Larsen Civil Rights Act for creating a sexually hostile environment, failing to prevent and remedy that environment, and aiding and abetting state law violations (Counts 3– 5).  The state attorney general's office filed an appearance on behalf of all defendants except Perkins.

The plaintiff filed an amended complaint on March 15, which identified the defendants by their correct names (Zachary Perkins, Frederick Udell, Robert Johnson, Brian Evers, Jessica Smalley-Thompson) and added a new defendant, Thomas Jones.  Perkins retained his own attorney and filed a crossclaim against the MDOC.  The claims against Perkins were resolved and he was

dismissed from the case on January 7, 2021. Ball also agreed to dismiss various claims against some of the defendants. The claims that remain are allegations of (1) cruel and unusual punishment against Udell and Johnson; (2) First Amendment retaliation against Udell and Evers; (3) violations of the Elliot Larsen Civil Rights Act against Udell and Johnson for providing "aid" to Perkins's sex discrimination, thereby creating a hostile work environment, and (4) *quid pro quo* discrimination against Udell, Johnson, and Evers. Ball has abandoned the claims against Smalley-Thompson. The defendants have moved for summary judgment on all Ball's remaining claims.

## II.

Under Federal Rule of Civil Procedure 56(a), summary judgment should be granted to a moving party who can "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627 (6th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "The moving party bears the burden of showing that no genuine issues of material fact exist," and it "must demonstrate the 'basis for its motion, and identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* at 627-28 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

To rebut that showing, "[t]he nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 628 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (quotation marks omitted)). The opposing party

- 9 -

must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

"The reviewing court must then determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Pittman*, 901 F.3d at 628 (quoting *Anderson*, 477 U.S. at 251-52). In doing so, the Court must "view the facts and draw all reasonable inferences in favor of the non-moving party." *Ibid.* (quoting *Matsushita*, 475 U.S. at 587).

## A.  Abandoned Claims

As noted above, Ball's response to the motion for summary judgment indicates his abandonment of all claims against defendant Jessica Smalley-Thompson.  He also is not pursuing any claims against defendant Brian Evers except his First Amendment retaliation claim in Count 2 of the second amended complaint.  Nor is he maintaining the First Amendment claim against defendant Robert Johnson.  And he is maintaining his state law claims under ELCRA against only defendants Frederick Udell and Johnson.

The federal claims are brought under 42 U.S.C. § 1983; Ball must offer evidence that a person acting under color of state law deprived him of a right secured by the Constitution or laws of the United States.  *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)).  And he must establish the liability of each defendant by that person's own conduct.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

Summary judgment will be granted in favor of the defendants on the claims Ball has elected not to pursue.

### B.  Eighth Amendment Claim

Ball alleges that defendants Johnson and Udell violated his Eighth Amendment right to be free from cruel and unusual punishment by their deliberate indifference to Perkins's ongoing sexual harassment.

The Eighth Amendment, as made applicable to states via the Fourteenth Amendment, *United States v. Georgia*, 546 U.S. 151, 187 (2006), prohibits the infliction of "cruel and unusual punishments" against prisoners.  U.S. Const. amend. VIII. Federal courts have interpreted the amendment to prohibit "any punishment that violates civilized standards of decency or reflects unnecessary and wanton infliction of pain." *Solomon v. Michigan Dep't of Corr.,* 478 F. App'x 318, 320 (6th Cir. 2012) (citing *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976)).

To sustain such a claim under the Eighth Amendment, a person in state custody must show that the prison official was deliberately indifferent to "a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  The applicable test has two elements. *Id*. at 834.  First, the plaintiff must demonstrate that the constitutional deprivation was "objectively, 'sufficiently serious.'" *Ibid*. (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  Second, he must demonstrate that the detention official had a "sufficiently culpable state of mind." *Ibid*.  This element can be proven by circumstantial evidence from which the fact finder can conclude that the state actor perceived the risk, *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001), or "from the very fact that the risk was obvious." *Terrance v. Northville Reg'l Psych. Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002).

1. Objective Element

Ball has satisfied the objective element.  The parties agree that Perkins repeatedly sexually harassed Ball for about two months by conducting phony pat-downs, groping his genitals, and discussing deeply sexual and personal topics with him, which resulted in the termination of Perkins's employment.  The Sixth Circuit "held nearly three decades ago that sexual abuse of inmates can violate the Eighth Amendment even in the absence of physical touching by a corrections officer."   *Rafferty v. Trumbull Cnty., Ohio*, 915 F.3d 1087, 1096 (6th Cir. 2019) (holding that officer's demands that inmate expose her breasts and masturbate in his presence violates the Eighth Amendment) (citing *Kent v. Johnson*, 821 F.2d 1220 (6th Cir. 1987); *Calhoun v. DeTella*, 319 F.3d 936 (7th Cir. 2003); *Daskalea v. Dist. of Columbia*, 227 F.3d 433 (D.C. Cir. 2000)).

The defendants disagree, contending that "isolated and brief unwanted or inappropriate touching does not" constitute an injury sufficiently serious to support an Eighth Amendment claim. However, the record shows that the harassment continued for about two months, with Perkins regularly visiting Ball up to four times per week, subjecting Ball to unnecessary and invasive pat-downs during which Perkins fondled Ball's genitals, and often called Ball derogatory names, like "fag," "sissy" and "d*ck sucker" in front of other inmates.  This continuous sexual abuse led a doctor to diagnose Ball with PTSD with a "poor prognosis for . . . recovery."   In one of the cases the defendants cite, *Jackson v. Madery*, the court of appeals emphasized "that 'there can be no doubt that severe or repetitive sexual abuse of an inmate by a prison officer can be 'objectively, sufficiently serious' enough to constitute an Eighth Amendment violation.'"   158 F. App'x 656, 662 (6th Cir. 2005) (quoting *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997)).  That is what Ball's proofs show here.

The defendants argue that Michigan's Prison Litigation Reform Act (PLRA), Mich. Comp. Laws § 600.5501 *et seq.*, precludes Ball's action, as it provides that "a prisoner shall not bring an action against this state . . . or an official, employee, or agent of this state . . . for mental or emotional injury suffered while in custody without showing of physical injury arising out of the incident giving rise to the emotional injury." Mich. Comp. Laws § 600.5511(1); Mot. Summ. J. ECF No. 62, PageID.658. That state statute, however, has no bearing on Ball's federal claims. *See Jones v. Bock*, 549 U.S. 199 (2007) (applying federal PLRA to MDOC inmates); *accord Woodford v. NGO*, 548 U.S. 81 (2006) (applying federal PLRA to California state prisoners). Nor does the federal PLRA preclude this action because the case was filed *after* Ball was released from prison. *See Napier v. Laurel Cnty.*, 636 F.3d 218, 221 (6th Cir. 2011) (the only relevant "question is: 'Is the plaintiff a prisoner confined in a jail, prison, or other correctional facility?'") (quoting *Cox v. Mayer*, 332 F.3d 422, 424 (6th Cir. 2003) (applying Michigan's PLRA to a plaintiff who was no longer incarcerated because he was a prisoner *when he filed suit.*)); *accord Marbry v. Freeman*, 489 F. Supp. 2d 782, 785 (E.D. Mich. 2007) ("the PLRA clearly and unambiguously limits [its application] to plaintiffs who are confined, incarcerated or detained in prison for criminal violations at the time suit is filed."). And even if the PLRA applied, it does not preclude Ball's claims. *See Meade v. Plummer*, 344 F. Supp. 2d 569, 573 (E.D. Mich. 2004 ("The plain language of the statute does not require dismissal of constitutional claims in which no physical injury is present, since nominal and punitive damages may be recovered in cases, such as this, where First Amendment violations are alleged"); *see also Calhoun*, 319 F. 3d at 940.

2. Subjective Element

Ball also must offer evidence showing that "the state official 'knows of and disregards an excessive risk to the [victim's] health or safety.'" *Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483,

493 (6th Cir. 2002) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 509, 513–16 (6th Cir. 2002)). Under this definition, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "Once the state actor draws the necessary inference, 'the official must act or fail to act in a manner demonstrating reckless or callous indifference toward the individual's rights.'" *Sperle*, 297 F.3d at 493 (quoting *Ewolski*, 287 F.3d at 513).

### a. Udell

Ball has furnished sufficient evidence to create a fact issue about whether Udell knew of Perkins's ongoing harassment but deliberately ignored it. Investigator Johnson reported that, for a period of about eight weeks, Perkins routinely visited Ball up to four times per week in the C-Unit to sexually harass Ball while Udell staffed the lobby. Joseph Christlieb, who was held in the same cube as Ball, testified in his affidavit that "Perkins would come into the cube almost every day when [] Udell was on duty" and often called Ball derogatory names, including "fag," "sissy" and "d*ck sucker," in a voice "loud[] enough to be heard throughout the front hall." Christlieb Aff., ECF No. 71-16, PageID.1367, ¶¶ 2, 9. Ball testified that "Udell's desk was only a couple feet away, [] he was looking directly at Perkins and [Ball] during these interactions," and "Perkins would speak in a loud voice," making the conversations easily heard. Ball Aff., ECF No. 71-13, PageID.1284, ¶ 35; Ball dep., ECF No. 71-10, PageID.1232.

Udell admitted during his deposition that he saw Perkins repeatedly visit Ball's cell and told Investigator Johnson that Perkins "always" went to Ball's cube when he visited the C-Unit and that the visits lasted a "while . . . maybe 10 or 15 minutes," sometimes longer. However, he maintained that he never heard the contents of the conversations. Perkins testified otherwise, stating that "Udell was at the desk and heard my discussion with Ball [about the frequency with

which he saw penises].  Udell later made some comment about my conversation with Ball, so I know he heard what we were discussing."  Perkins Aff., ECF No. 71-17, PageID.1371, ¶ 11.

Ball also testified that Perkins conducted "shakedowns" of Ball's cube in the presence of Udell, during which Perkins would pat him down and fondle his genitals.  Ball testified that Perkins often directed Ball to go to the dayroom, which was beside the officer's station in the lobby, and they would pass Udell on the way.

The defendants concede that Ball's "self-serving Affidavits may create a question of fact as to what Defendant Udell saw or heard [] Perkins do," but maintain Udell was not personally involved with the harassment.  However, participation in sexual harassment is not necessary to establish a deliberate indifference claim.  Ball simply must demonstrate that Udell was aware of the facts that may give rise to an inference that a substantial risk of harm existed and that Udell "fail[ed] to act in a manner demonstrating reckless or callous indifference toward" Ball's rights.  *Sperle*, 297 F.3d at 493 (quoting *Ewolski*, 287 F.3d at 513).

Ball provided enough evidence to raise a question about whether Udell knew about Perkins's repetitive harassment of the plaintiff, especially considering his open homosexuality and small stature.  Perkins testified" "I would often talk with Udell about Larry Ball.  We both knew Ball was gay.  Udell and I would look at Ball's file."  Perkins Aff., ECF No. 71-17, PageID.1371, ¶ 9.  The record shows that Udell did nothing to stop or even inquire about the harassment, even though he was required to do so.  *Id.* at ¶ 12 ("Udell never told me to stop coming, and never told me that he thought my visits were inappropriate."); Evers Dep., ECF No. 71-8, PageID.1143-44 (testifying that staff are "required to report issues of overfamiliarity.")  In fact, Investigator Johnson's report indicates that "Udell was initially hesitant [to cooperate with the investigation]

and clearly reluctant to provide truthful responses, but he eventually did so."  ECF No. 71-5, PageID.1018.

Questions of fact preclude judgment for Udell as a matter of law on Ball's Eighth Amendment claim.

### b.  Johnson

Ball alleges that Johnson was deliberately indifferent to Perkins's harassment because (1) he did not start his investigation until June 10, 2016, even though Ball complained to him on May 24; (2) he did nothing to protect Ball from Perkins until he submitted his report to the Warden on August 2; (3) Johnson alerted both staff and prisoners that Ball snitched on Perkins; and (4) Johnson called Ball the "queen" of the facility and requested that Ball act as "bait" for Perkins and other guards that Johnson suspect of being involved with smuggling.

The record, however, shows that Johnson's actions directly led to the MDOC's stop order against Perkins and, ultimately, to his termination.  Johnson maintains that he did not learn about any alleged harassment until June 10, when he was told about allegations that Perkins sent Cook an inappropriate letter.  Even accepting Ball's allegation as true, only two weeks elapsed before Johnson thoroughly investigated the matter, during which he conducted 12 interviews and issued follow-up questionnaires.  He eventually concluded that Perkins violated numerous work rules. Johnson's actions prompted the MDOC to transfer Udell from the C-Unit on June 19, 2016 — just three days after Johnson interviewed Udell.  And within two months from the start of the investigation, the MDOC issued a stop order against Perkins from entering the facility.  The MDOC formally terminated Perkins about one month after the issuance of the stop order. Although Johnson could have conceivably conducted his investigation faster and submitted his

report sooner, these facts do not show that Johnson deliberately ignored the risk Perkins posed to Ball.

The record does not support Ball's complaint that Johnson did nothing to protect him from Perkins. The record is unclear about whether Johnson issued a formal "no contact" order. *Compare* Perkins Aff., ECF No. 71-17, PageID.1372, ¶ 19 ("After I was informed of the investigation, Inspector Johnson told me that I was to have "no contact" with Ball) *with* Johnson Dep., ECF No. 62-9, PageID.834 (testifying that he "never . . . heard of a no contact order" and that he "absolutely" would never "have discussed with [] Ball the existence" of such an order). Regardless, Ball concedes that Perkins stopped visiting Ball around "early June" — right around when Johnson began his investigation. Ball also argues that Johnson violated the MDOC's PREA manual, which imposes a 90-day monitoring period for those participating in investigations where any retaliatory conduct could be reported. But Ball cites no authority for the idea that violating a state PREA manual can give rise to a constitutional violation.

Nor does the record contain any evidence — even "self-serving" testimony — that Johnson accused Ball of snitching. Ball relies on Perkins's and inmate Christlieb's affidavits for this contention. Perkins Aff., ECF No. 71-17, PageID.1371, ¶ 14 ("After Udell and I were interviewed by Inspector Johnson in June 2015, Johnson made it clear that Ball had snitched on us."); Christlieb Aff., ECF No. 71-16, PageID.1367, ¶ 11 ("During that interview, it was clear that Ball had snitched on Perkins."). But these affidavits show only that the interview process involving Perkins's harassment pointed to Ball as a snitch, not that Johnson accused him of being one. Johnson cannot be accused of deliberate indifference to Ball's risk of harm by interviewing witnesses, which led them to believe that Ball snitched on a corrections officer.

- 17 -

Finally, Johnson's conduct of calling Ball the "queen" of the facility and requesting that he act as "bait" for Perkins and other guards (which he denies) has nothing to do with Perkins's sexual assaults, which had stopped almost over a month before Johnson allegedly made this request.  That request — however inappropriate it may have been — was in fact an effort to further inculpate Perkins; it was not an act of callous disregard to Ball's sexual harassment, which had stopped at that point.

Ball's allegations, even if true, do not create a genuine issue of material fact that Johnson was deliberately indifferent to Perkins's ongoing sexual abuse of Ball.  Johnson is entitled to summary judgment on Ball's eighth Amendment claim.

### C.   First Amendment Claim

Ball contends that the defendants separately retaliated against him in violation of the First Amendment for reporting Perkins's harassment.  Ball must offer evidence that he engaged in protected conduct that provoked the defendants, at least in part, to take an adverse action against him.  *Maben v. Thelen*, 887 F.3d 252, 262 (6th Cir. 2018) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).

The record plainly shows that Ball engaged in protected speech.  The defendants contend otherwise because Ball never filed a grievance or formally reported Perkins's behavior to any MDOC official while he was incarcerated at the Gus Harrison facility.  That is beside the point.  Ball's protected speech need not conform to the prison's grievance rules.  *Holzemer v. City of Memphis*, 621 F.3d 512, 521 (6th Cir. 2010) ("Nothing in the First Amendment itself suggests that the right to petition for redress of grievances only attaches when the petitioning takes a specific form.").  His protected speech can be "written or oral."  *Maben*, 887 F.3d at 265.

The ensuing "adverse action" must be something that "would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Thaddeus–X*, 175 F.3d at 396. "Inconsequential" or "*de minimis*" actions don't count. *Thaddeus–X*, 175 F.3d at 396 (citing *Ingraham v. Wright*, 430 U.S. 651, 674 (1977)). Nonetheless, the resolution of that element usually "is a question of fact," *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002), that "should go to the jury." *Maben*, 887 F.3d 256 (citations omitted).

The adverse action tied to Udell consists of him yelling at Ball and accusing him of being a snitch as Ball was walking in the open yard. Udell says he did not do that, but Ball testified that Udell yelled the comment through a window while Ball was out on the yard; it is fair to infer that other inmates heard the remark. The defendants also contend that the comment was not enough to constitute adverse action, as demonstrated by Ball's continued reporting of the harassment to MDOC officials and expressing concerns about his safety to Johnson and Smalley-Thompson. Those arguments misapply the controlling law.

It doesn't take much to conclude that calling a prisoner a snitch in the open and in front of other inmates certainly can be "consequential." It is widely understood that prisoners do not take kindly to those who report others to authorities. *Cantazaro v. Mich. Dep't Corr.*, No. 08-11173, 2011 WL 768115, at *5 (E.D. Mich. Feb. 10, 2011) (noting a "long line of cases recognizing the dangers of a prison inmate being labeled a 'snitch,' and the resulting 'threat to an inmate's health and safety.'") (quoting *David v. Hill*, 401 F.Supp.2d 749 (S.D. Tex. 2005)). Udell's comments "justifiably created massive fear" for Ball. The day after Udell accused Ball of being a snitch (and after Johnson interviewed several prisoners), a member of the Gangster Disciples housed in Ball's cube cornered Ball in the bathroom and threatened him. Courts have held that similar public comments constituted an adverse action in the First Amendment context. *See Aaron v. Tyluki*, 12–

14866, 2013 WL 4670902, at *7 (E.D. Mich. Aug. 30, 2013) ("This Court finds that Plaintiff could prove adverse actions for both defendants based on Plaintiff's sworn allegations that each defendant called him a "snitch" and "rat" in front of other inmates."); *Jackson v. Peterson,* No. 96–1144, 1996 WL 636180 (6th Cir. 1996) (Table) (although a prisoner "has no inherent constitutional right . . . to remain free from being labeled a 'snitch' by prison guards, he may state a constitutional violation if he can establish that the guards revealed his identity to fellow inmates in retaliation against him for having exercised his First Amendment right . . .").

Even if Ball himself was not intimidated, the measure of adversity is objective, that is, "'whether a person of ordinary firmness would be deterred, not whether the [plaintiff] himself actually was deterred.'" *Holzemer*, 621 F.3d at 525 (quoting *Harris v. Bornhorst*, 513 F.3d 503 at 519 (6th Cir. 2008)). Ball has shown that Udell took adverse action against him.

Ball says that Evers retaliated against him by arranging a search of Ball's cube that resulted in a citation for smuggling feminine products into his cell. Ball was then placed in segregation for several days until he was given a hearing, resulting in a dismissal of the smuggling charge, but he was still placed in a higher security level. Those actions are sufficiently adverse to satisfy this element. *Hill v. Lapin*, 630 F.3d 468, 474 (6th Cir. 2010) (holding that "actions that result in more restrictions and fewer privileges for prisoners are considered adverse"); *Maben*, 887 F.3d at 267 ("the deprivation of privileges is hardly 'inconsequential' — indeed, they are all that prisoners really have"). A retaliatory cell search can constitute an adverse action. *Bell*, 308 F.3d at 604 (citing *Walker v. Bain*, 257 F.3d 660, 664 (6th Cir. 2001)).

Evers says that the action was not "adverse" because the contraband charge was sustained by the issuance of a ticket, and also that he had nothing to do with the search. But finding some evidence justifying the accusation does not "checkmate[] [the] retaliation claim." *Maben*, 887

F.3d at 261 (citing *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994)).  And even though Evers's name does not appear on the ticket, Evers testified that, as the Resident Unit Manager, he could "direct people to do searches anywhere," that he did so "quite a bit," although the corrections officers are the ones who actually conduct the searches.  It would be reasonable to infer that Evers was behind the search of Ball's cell.

Ball also must connect the adverse actions to his protected conduct by showing that it "proximately caused" the adverse action, and then determining if the defendant's motive was "'to punish [the plaintiff] for the exercise of a constitutional right.'" *Paterek*, 801 F.3d 630, 646 (6th Cir. 2015) (quoting *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012)).  "'[T]he temporal proximity between protected conduct and retaliatory acts" is relevant.  *Maben*, 887 F.3d at 268 (quoting *King*, 680 F.3d at 695–96); *Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004).  If the proofs sustain such an inference, the defendant can avoid liability by showing "that he would have taken the same action in the absence of the protected activity." *Thaddeus–X*, 175 F.3d at 399.

The temporal proximity between Ball's protected speech and Udell's alleged retaliation supports the inference that Ball's speech caused Udell's retaliation.  *See Muhammad*, 379 F.3d at 417-18 ("[T]emporal proximity alone may be significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.").  Ball testified that he complained about Perkins's harassment on May 24, 2016; Johnson interviewed Udell on June 16; Udell was transferred from the C-Unit on June 19; and two days later, he publicly accused Ball of snitching on June 21.  Udell does not argue that he would have called Ball a snitch absent Ball's protected speech.

Ball produced enough evidence from which a reasonable jury could infer that Udell adversely acted against Ball for exercising his First Amendment right.

Temporal proximity also supports an inference that Evers ordered the cell search because of Ball's harassment complaints against a prison guard.  However, Evers testified that the Gus Harrison facility maintained a policy of searching each cube (which holds eight individual cells) at least once per month.  He also testified that he was "pretty active" in ordering these searches and directed staff to search inmate cells "multiple times a week."  He explained that as a baseline, each officer was required to conduct searches of three cells (not cubes) throughout the facility each day in 2016, but that requirement was relaxed to two cells per day in 2017 or 2018.  Ball has not offered any evidence to rebut that testimony.  Evers, therefore, has established without contest that Ball's cube would likely have been searched as a routine practice regardless of whether Ball complained about Perkins.  *See Thaddeus–X*, 175 F.3d at 399.

Although Ball produced enough evidence to make out a *prima facie* retaliation claim against Evers, he failed to rebut Evers's sufficient showing that he would have searched Ball's cube regardless.

Ball's First Amendment retaliation claim against Udell survives summary judgment, but Evers is entitled to judgment in his favor on that claim as a matter of law.

### D.  Qualified Immunity

Udell contends that he is entitled to qualified immunity on the two federal claims that survive against him.  The doctrine of qualified immunity insulates state actors from liability so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Once the qualified immunity defense is raised, "the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established."  *McDonald v. Flake*, 814

F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)).

"A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Even when there is no case defining a constitutional right that directly mirrors the fact pattern confronted by the defendant, "'an official can be on notice that his conduct violates established law even in novel factual situations.'" *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019) (quoting *Littlejohn v. Myers*, 684 F. App'x 563, 569 (6th Cir. 2017) (quoting *Hope v. Pelzer*, 536 U.S. 730, 731 (2002))). The touchstone of the "clearly established" inquiry is "fair warning." *Baynes*, 799 F.3d at 612-13 (quoting *Hope*, 536 U.S. at 741). "Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

The qualified immunity defense may be raised at any stage of the case. When it is raised in a motion for summary judgment, as here, courts must weave the summary judgment standard into each step of the qualified immunity analysis. *Scott*, 550 U.S. at 380. That means that the court must view the facts in the light most favorable to the plaintiff. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott*, 550 U.S. at 378.

Ball has brought facts to show that defendant Udell violated his Eighth Amendment right to be free from cruel and unusual punishment. That right was clearly established at the time. *Rafferty*, 915 F.3d 1087 (remarking that the court of appeals "held nearly three decades ago that sexual abuse of inmates can violate the Eighth Amendment even in the absence of physical

touching by a corrections officer").  And it is clearly established that, even though an officer did not directly participate in the alleged constitutional violation, he or she may still be held liable for showing "deliberate indifference" to a known risk of harm.  *Farmer*, 511 U.S. at 828.

Similarly, fact questions exist about whether Udell retaliated against Ball by calling him a snitch in the open yard after Ball allegedly reported Perkins's conduct, which resulted in the MDOC transferring Udell from the C-Unit.  And, again, it is clearly established that a prisoner has a right under the First Amendment to complain about prison conditions, and particularly about sexual harassment.  *Maben*, 887 F.3d at 269 ("[T]his Court has repeatedly recognized that if a prison officer 'retaliated against [a prisoner] for filing grievances,' the 'alleged conduct also comprises a violation of clearly established constitutional law.'") (quoting *Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996)); *see also Bell*, 308 F.3d at 612; *Jackson*, No. 96–1144, 1996 WL 636180 (6th Cir. 1996) (accusing an inmate of snitching in front of others may constitute an adverse action).

Qualified immunity will not shield defendant Udell from the plaintiff's federal claims.

### E.  State Law Claims

Ball also alleges in his second amended complaint that the defendants violated the Michigan Elliot Larsen Civil Rights Act by creating a sexually hostile environment and engaging in *quid pro quo* sexual harassment.  Count 3 alleges *quid pro quo* harassment and the creation of a sexually hostile prison environment.  Count 4 alleges that the defendants failed to prevent or remedy the sexually hostile prison environment.  Count 5 alleges that the defendants aided and abetted violations of the ELCRA.  These counts are directed at all the defendants.  However, in his response to the motion for summary judgment, Ball limits these state law claims to defendants Johnson and Udell for aiding Perkins's harassing conduct and *quid pro quo* discrimination.  The

Court read that concession as an abandonment of Count 3 (which largely pertains to Perkins's harassment) and a fusion of Counts 4 and 5, since Ball now argues that Udell and Johnson "aided" Perkins's violations of the ELCRA by knowingly failing to prevent or to remedy the ongoing harassment. Count 4 duplicates Count 5. Counts 3 and 4 will be dismissed.

Despite the Michigan legislature's pronouncement otherwise, Mich. Comp. Laws § 37.2301(b), the ELCRA has been found by Michigan courts to apply to MDOC prisoners. *Does 11-18 v. Dep't of Corr.*, 323 Mich. App. 479, 489, 917 N.W.2d 730, 736 (2018). The ELCRA prohibits sexual harassment in the form of conditioning public services on sexual favors and a hostile or offensive environment based on sex. Mich. Comp. Laws § 37.2103(i)-(iii). These three statutory definitions "describe quid pro quo sexual harassment [and] . . . hostile-environment sexual harassment." *Hamed v. Wayne Cnty*, 490 Mich. 1, 9, 803 N.W.2d 237, 244 (2011).

The ELCRA also declares that "a person shall not . . . [a]id, abet, incite, compel, or coerce a person to engage in a violation of" the Act. Mich. Comp. Laws § 37.201(a). "[A]iding and abetting 'describes all forms of assistance rendered to the perpetrator of a [violation] and comprehends all words or deeds that might support, encourage, or incite the commission of a crime." *Tackett v. Trierweiler*, 956 F.3d 358 (6th Cir. 2020) (quoting *People v. Carines*, 460 Mich. 750, 597 N.W.2d 130, 135 (1999)). To succeed on this theory, Ball must offer evidence showing that "(1) the party aided by the defendant performed a wrongful act that caused an injury, (2) the defendant had general awareness 'of his role as part of an overall illegal or tortious activity at the time that he provide[d] the assistance,' and (3) the defendant knowingly and substantially assisted the principal act of discrimination." *Fortenberry v. Jenkins-Dick Corp.*, No. 242225, 2003 WL 22849770, at *2 (Mich. Ct. App. Dec. 2, 2003) (quoting *Hurley v. Atlantic City Police Dep't,* 174 F.3d 95, 127 (3d Cir. 1999)).

Ball criticizes this recitation of the elements of an aiding or abetting liability theory, contending that it does not give due regard for the distinction between "abetting," which has been defined by Michigan courts in the criminal context requiring some form of intentionality, and "aiding," which does not.  *See People v. Pitts*, 84 Mich. App. 656, 659-60, 270 N.W.2d 482, 484 (1978).  But even accepting that criticism, Ball still must demonstrate that the defendants at least "performed acts that aid[ed] in the creation of the circumstances or participate[d] in an enterprise, the scope being such that the result is reasonably foreseeable."  *Pitts*, 84 Mich. App. at 660, 270 N.W.2d at 484.

### 1.  Hostile Environment

Michigan courts considering a hostile work environment claim require plaintiffs to show that:

> (1) [they] belonged to a protected group;
> (2) [they were] subjected to communication or conduct on the basis of sex;
> (3) [they were] subjected to unwelcome sexual conduct or communication;
> (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the [provision of public services] or created an intimidating, hostile, or offensive [public services] environment; and
> (5) respondeat superior.

*Radtke v. Everett*, 442 Mich. 368, 382-83 501 N.W.2d 155, 162 (1993) (citing Mich. Comp. Laws § 37.2103(h), 37.2202(1)); *see also Neal v. Dep't of Corr.*, No. 285232, 2009 WL 187813, at *2 (Mich. Ct. App. Jan. 27, 2009) (applying these elements to a hostile environment claim by Michigan prisoners against the Michigan Department of Corrections).  Looking to these elements, the defendants argue that Ball's claim fails as a matter of law because an individual cannot be liable for the torts committed by a co-worker (Perkins), especially when the conduct migrates beyond the scope of the employer's business.  However, vicarious liability is not an essential element in the context of this case.  *See Elezovic v. Bennett*, 274 Mich. App. 1, 731 N.W.2d 452

(2007) (dropping the respondeat superior element where the plaintiff alleged that the employer, not an employee or co-worker, engaged in discriminatory behavior).    Moreover, Ball is not attempting to impose vicarious liability on Johnson or Udell; he alleges that their own conduct as aiders or abettors violated ELCRA.

The evidence of Perkins's misconduct easily satisfies *Radtke*'s first four elements.  Ball is in a protected group (individuals who are the objects of unwelcomed sexual advances, *Radtke*, 442 Mich. at 383, 501 N.W. 2d at 162) and was subjected to harassment and discrimination on the basis of his sex.  *Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 472 (6th Cir. 2012) (citing *Barbour v. Dep't of Soc. Servs.*, 198 Mich. App. 183, 185-86, 497 N.W.2d 216, 218 (1993) (rejecting argument that ELCRA proscribes discrimination based on sexual orientation but  holding that the trial "court erred in dismissing plaintiff's complaint insofar as it alleged specific homosexual advances directed to him [because t]hese actions were directly related to plaintiff's status as a male, and thus render the act applicable.")).  Perkins's persistent groping was unwelcome and it substantially interfered with the provision of public services or created an intimidating or hostile public services environment.  *Barbour*, 198 Mich. App. at 186, 497 N.W.2d at 218 ("A claim of hostile-environment sexual harassment may be based on single incident of harassment) (citing *Radtke*, 442 Mich. at 394-95, 501 N.W. 2d at 168).

A jury could conclude from the evidence that Udell aided and abetted Perkins's harassment of Ball.  That evidence tracks the proof of Udell's deliberate indifference to Perkins's conduct. Perkins routinely visited Ball in his cell at least four times per week when Udell was on duty in the unit lobby, even at times when Perkins had no business being in the cube.  Perkins could be heard using sexually charged language with Ball within Udell's earshot.  And Udell ultimately admitted to Investigator Johnson that Perkins "always" went to Ball's cube in the C-Unit, staying

with him for 10 to 15 minutes at a time and sometimes longer. Yet Udell continued to allow Perkins to have access to Ball, he did not report the abusive conduct, and he failed to report Perkins's "overfamiliarity" with Ball, even though the regulations required him to do so. That evidence supports the inference that Udell was aware of Perkins's "wrongful act" of harassment and that he "knowingly and substantially" assisted Perkins's continued harassment of Ball. *Fortenberry*, 2003 WL 22849770, at *2.

The evidence does not support Ball's aiding or abetting theory against Johnson. Ball bases this claim on Johnson's allegedly insufficient investigation and efforts to use Ball as "bait" to gather more inculpatory evidence against Perkins. But as discussed at length above, Johnson thoroughly investigated Perkins and alerted superiors about the ongoing harassment, which resulted in Perkins's termination. A defendant "may avoid liability 'if [he] adequately investigated and took prompt and appropriate remedial action upon notice of the alleged hostile work environment.'" *Radtke*, 442 Mich. at 396, 501 N.W. 2d at 168 (quoting *Downer v. Detroit Receiving Hosp.*, 191 Mich. App. 232, 234, 477 N.W.2d 146, 148 (1991)). Johnson did not engage in any act that aided Perkins's harassing conduct. And his attempt to use Ball in an undercover capacity to suss out Perkins's smuggling activity did not aid Perkins in his sexual harassment of Ball.

### 2. *Quid Pro Quo* Harassment

The evidence does not support Ball' *quid pro quo* harassment theory against Johnson or Udell. To establish a *quid pro quo* claim, Ball must show

> (1) that he . . . was subjected to any of the types of unwelcome sexual conduct or communication described in the statute and
> (2) that the public service provider or the public service provider's agent made submission to the proscribed conduct a term or condition of obtaining public services or used the plaintiff's submission to or rejection of the proscribed conduct as a factor in a decision affecting his or her receipt of public services.

*Hamed*, 490 Mich. at 10, 803 N.W.2d at 243.

Ball argues that Perkins targeted him as a gay male and "repeatedly ordered [Ball] to be pat down on the yard" and forced Ball "to submit to unwanted sexual advances to prevent disciplinary action against him." However, Ball has not provided any evidence that Perkins ever threatened Ball with disciplinary action if Ball rejected Perkins's advances. There is no evidence in the record that Perkins threatened Ball, either. Nonetheless, viewing the facts in a light most favorable to Ball, and considering the power dynamics at play (an inmate against a corrections officer), a reasonable jury could conclude that Perkins subjected Ball to *quid pro quo* harassment by forcing Ball to submit in exchange for staying out of trouble.

However, Ball has not pointed to any evidence that either Johnson or Udell were aware of any threats or exchanges between Perkins and Ball involving the exchange of sex for favors or disciplinary forbearance. Although Johnson asked Ball to act as "bait" to catch Perkins in smuggling activity, there is nothing to tie Johnson's request to an exchange based on sex. And Udell's allowance and even assistance of Perkins's hostile environment harassment is not linked in any way to an exchange.

The defendants are entitled to summary judgment on that theory.

### III.

The plaintiff has produced sufficient evidence to sustain his claims against defendant Frederick Udell for violating his rights under the Eighth and First Amendments and for aiding and abetting Zachary Perkins in creating a sexually hostile environment in violation of the Michigan Elliot Larsen Civil Rights Act. The plaintiff either has abandoned his claims against the other defendants or failed to offer enough evidence to create a genuine issue of material fact for trial.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment (ECF No. 62) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the second amended complaint is **DISMISSED** in all respects as to defendants Brian Evers, Jessica Smalley-Thompson, and Robert Johnson.

It is further **ORDERED** that the second amended complaint is **DISMISSED** as to defendant Frederick Udell, except as to Counts 1 and 2 and that part of Count 5 alleging a violation of the Michigan Elliot Larsen Civil Rights Act as aiding or abetting in the creating of a sexually hostile environment.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  July 27, 2021